of a certain sum. B. takes charge of the vessel for the purpose of fitting her up, and in so doing, but before a legal transfer is made, makes a contract for painting the cabins: *Held*, that A. is not liable personally for the work thus done.

[Libels in admiralty by John Heppard against the barges General Cadwalader and Major Ringgold, and William L. Ashmead and Theodore Birely, owners.] The libels in these cases were in rem et personam; and a decree pro confesso having passed against William L. Ashmead, a decree was asked, upon hearing, against the barges and against Theodore Birely. The barges were built at Philadelphia by Birely, and the legal title remained in his name; but by agreement between him and Ashmead, they were to become the property of the latter, on payment of a certain sum. They were fitting up, under Ashmead's direction, to carry passengers, and the libellant was engaged by him to paint the cabins. Birely was occasionally on board while the work was in progress, but gave no orders respecting it. After the barges had made repeated voyages in the service of Ashmead, he found himself unable to complete his bargain, and the barges were sold to a third person.

Mr. Vandyke, for libellant.

Mr. Ashmead, for respondents.

KANE, District Judge (after stating the facts as above). It is plain on these facts that this libel cannot be sustained against the vessel. The only lien which this court could enforce against it is that which obtains under the local law, and that expired when the vessel proceeded on her first voyage, after the work was done. Act Assem. Pa. June 13, 1836, § 2. The argument by which recourse is sought against Birely supposes a liability on the part of shipowners which the law does not warrant. They are not liable personally for work upon the ship, unless done by their order or on their credit. See the cases collected in the new edition of Abb. Shipp. p. 31 et seq. The case of Leonard v. Huntington, decided by Chief Justice Thompson (15 Johns. 302), is closely parallel to the present. There the defendant had contracted to sell, but retained the bill of sale until the purchase-money was paid; and he was held not liable for repairs done in the meantime by the orders of his equitable vendee. The court asserted substantially the same principle which the English courts have in later years decided to be the true one, that the question of liability refers itself directly and exclusively to the question, upon whose credit was the work done? 1 Russ. & M. 42.

I therefore dismiss the libels against the vessels and against Theodore Birely. Regarding all the circumstances, however, the case seems to be one in which the court may properly exercise a discretion as to the costs to be paid by the parties respectively, and I therefore order that the full costs being first

taxed, the one-half thereof be paid by the libellant, and the other by the respondents.

Vide People's Ferry Co. v. Beers, 20 How. [61 U. S.] 393; Roach v. Chapman, 22 How. [63 U. S.] 129; The St. Lawrence, 1 Black [66 U. S.] 522; The Coernine [Case No. 2,944]; The Revenue Cutter [Id. 11,713].

HEQUEMBOURG (LAKE v.). See Case No. 7,994.

## Case No. 6,391.

### The HERALD.[1]

District Court, E. D. Pennsylvania. Feb. 8, 1862.[2]

Prize — Falsification of Destination — False Statements of Master—Time Allowed for Appearance of Claimants.

[1. A vessel condemned because her destination was falsified at the port of departure, and because the master, in the preparatory examination, made false statements as to the ownership of the cargo.]

[2. Cargo shipped under bills of lading showing apparent ownership in an absent party capable of claiming, whose ownership is also affirmed by the master in his preparatory examination, will not be finally condemned until such party has had the benefit of the rule allowing a year for the assertion of claims, although this evidence of his ownership is subsequently contradicted by the master, and by other evidence asserting ownership in a third person, who is held incapable of claiming.]

In admiralty.

CADWALADER, District Judge. The case of this vessel and that of her cargo are somewhat complicated with each other. As to the vessel—of which fifty-nine sixty-fourths are of alleged British ownership—the principal questions are:—(1) Should the case be ruled by the law of war? (2) Was Beaufort harbor effectively blockaded? (3) Was there a breach of blockade? (4) Did the notification of the intended blockade of the ports of North Carolina render a vessel sailing afterwards, as this vessel did, for a port of that state from a port of the United States, liable to capture and condemnation, independently of any question of actual blockade of the port of destination? (5) Independently of any question of blockade, ought she to be condemned either for the sole reason that her clearance at Boston, when she was bound for Beaufort, was falsified so as to represent a fictitious destination for a friendly foreign port, or on account of this and other facts considered in combination with one another, and also in connection with negative circumstances of the case?

I think that the law of maritime war should rule the case. Beaufort harbor was not blockaded when this vessel entered it,

1 [Not previously reported.]

2 [Affirmed by circuit court: case unreported. Decree of circuit court affirmed by supreme court in 3 Wall. (70 U. S.) 768.]

on the 10th of June, 1861. Whether it was effectively blockaded on the 14th of July, 1861, when she left it, is an unimportant inquiry; because, if there was then a blockade, there was, according to the rules prescribed in the president's previous proclamations, afterwards confirmed by congress, no breach of blockade. So far as the vessel is concerned, the voyage was, under the charter party, from Boston, by way of Beaufort, to Liverpool; so that the primary destination to Beaufort, not less than the ulterior destination to Liverpool, must be considered. There had been a complete notification of the intended blockade; and the parties had actual knowledge of it before she left Boston. Whether, under the fourth question, the rule of decision should be the same as if the port of departure had been within a foreign jurisdiction, involves a point of great importance, which it is not necessary to decide, because the destination was falsified.

The master's conduct is, in some respects, inexplicable, if the whole truth as to interests in the profits of the voyage has, at this time, even after the latitude of proof which has been allowed, been fairly disclosed. But, if these obscurities are disregarded, the case of the vessel may be decided on either of two simple grounds, upon either of which further proof should, from the first, have been disallowed. She should be condemned, both because her destination was falsified at the port of departure, and because the master, in the preparatory examination, made false statements for the purpose of deception as to the ownership of the cargo. The indulgence which, in matters of practice, has, in the earlier stages of the present hostilities, been extended in all cases of maritime capture, has, in this case, perhaps, been extended rather too far in disregarding the defects in the test oath of the alleged owners of this vessel. The entry of the decree condemning her will be postponed for a few days, if they desire to file a suppletory test oath to go up in case of an appeal.

As to the cargo, the transactions in which Messrs. Williams and Parmelee were concerned require more satisfactory explanations than have been offered or sustained. The claim of Mr. Williams for the tar and rosin and a portion of the spirits of turpentine cannot be allowed. But, in rejecting it, I ought not, at once, to condemn the subjects of it. The bills of lading for this part of the cargo describe the shipper as agent of the Liverpool consignees. This indicates an ownership in parties who, according to the rule of proceeding, are allowed a year to prosecute their claim. Their ownership was moreover affirmed by the master in the preparatory examination. However this may have been contradicted by his own subsequent affidavit, and by the further proof which has been adduced on behalf of Mr. Williams, the contradiction does not affect these absent parties, or shorten the time of a year, which is allowed to parties not incapable of claiming.

The shipments of tobacco are, according to the respective bills of lading, for the account of other parties in England, to whom the like delay should be extended. The particular distinctions in the facts are attended with no such difference as excludes the application of the rule of practice. The claim interposed by the captain on behalf of other parties who are probably the true owners of the tobacco is rejected. They are parties incapable of any standing in this court as claimants. But its rejection, as in the other case, does not affect other parties who are, as yet, unrepresented, however improbable it may seem that they will ever appear as claimants.

The several shipments of spirits of turpentine, which are not included in the claim of Mr. Williams, have been claimed by the master, on behalf of the respective owners. They are parties who can have no standing in court as claimants. These claims are rejected, and the subjects of them condemned. But, as the vessel is of alleged foreign ownership, and the cargo has not been unladen, the decree of condemnation will not be entered as to any part of it until the formal condemnation of the vessel. On all the questions of the case I have prepared a fuller opinion, which may, perhaps, be filed hereafter.

[NOTE. An appeal was then taken by the claimants to the circuit court, where the decree was affirmed. From this decree they appealed to the supreme court, where the decree was duly affirmed in an opinion by Mr. Chief Justice Chase, who said that under all the circumstances of the case a knowledge of the blockade must be inferred against the master of the vessel. 3 Wall. (70 U. S.) 768.]

---

## Case No. 6,392.

### The HERALD, Etc.

[8 Ben. 263.] [1]

District Court, S. D. New York. Dec., 1875.

COLLISION IN THE HUDSON RIVER—TUG-BOAT AND TOW.

1. The barge A. was towed by the steamboat H. astern at the end of two hawsers, being steered by her own helm. In passing the steamer C. and a fleet of twenty-five canal-boats, which she was towing up the river astern of her, the barge took a sheer towards the canal-boats and came in collision with one of them, while the H. and two boats which she had alongside, passed clear of all. In a suit brought against the H., the C. and the A., to recover for the damages sustained by the canal-boat: *Held,* that, under the circumstances, it was for the A. to establish that this sheer was caused by some fault on the part of the H.

[Cited in The Ciampa Emilia, 46 Fed. 867.]

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]